UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLAUDE APLIN,

    Plaintiff,

v.

FAURECIA INTERIOR SYSTEMS, INC.,

    Defendant.

Case No. 18-10703
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [34] AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [27]**

For about four years, Claude Aplin worked on an automotive-part production line for Faurecia Interior Systems. Aplin says that at one point during his tenure at Faurecia, his supervisor subjected him to more work, despite knowing that he was an older employee (he was 63 at the time). Aplin had difficulty keeping up with the work and went to his doctor. Due to symptoms attributable to hypertension, hyperglycemia, or kidney disease (or some combination), Aplin's doctor prescribed that Aplin could not lift objects and could not perform fast-paced work. When Faurecia could find no job that fit those restrictions, Aplin was forced to take leave for five months. After Aplin's doctor lifted Aplin's restrictions, he returned to Faurecia and resumed work on a production line. But eventually, Aplin was assigned a job on a line that he could not keep up with. He told his supervisor that he could not keep up because of his "age and health," but his supervisor insisted that he keep at it. Aplin decided to resign.

Aplin sued Faurecia for, among other things, age and disability discrimination.

Faurecia seeks summary judgment, Executive Magistrate Judge R. Steven Whalen recommends that this Court grant it, and Aplin objects. As will be explained, Aplin's objections

are not procedurally proper, and so the Court will adopt Magistrate Judge Whalen's report and recommendation. Alternatively, the Court overrules Aplin's objections on the merits and adopts the report and recommendation.

# I.

## A.

The following is a summary of the key facts—when viewed in the light most favorable to Aplin. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In 2013, Aplin started working for Faurecia in the company's Saline, Michigan plant. (ECF No. 28, PageID.231.) Faurecia makes interior parts for automobiles, things like dashboards and door panels. (*Id.* at PageID.231.) In his role with Faurecia, Aplin worked on a part-production line. (*See id.* at PageID.148, 207, 232.) On a production line, workers are given only so much time, say 58 seconds, to complete their work on a part before the next part arrives at their workstation. (*See id.* at PageID.148, 207, 232.) Line workers would sometimes work 12-hour days. (*Id.* at PageID.202.) Aplin was 60 years old at the time of his hire. (*See id.* at PageID.157.)

In 2016, Aplin was staffed on a production line for the console for Lincoln Navigators and Ford Expeditions. (ECF No. 28, PageID.202.) His supervisor at the time was Mark Harvey. (*Id.*) Aplin recalls that "[Harvey and I] were talking on the line one day about me working and my pace was slower. He said, maybe if you were a little younger, and I don't know, maybe if you [were] a different person." (ECF No. 28, PageID.185.) (Aplin believes the "different person" remark was about his race, but he has brought no legal claim based on race.)

In May 2016, when Aplin was 63 years old, the line position next to Aplin's was eliminated. (ECF No. 28, PageID.183, 202.) Aplin was required to do the work of the eliminated position and his prior work—without any additional time to get all the work done. (*Id.*) Over a 12-

hour shift, Aplin started to fall behind. (ECF No. 28, PageID.202.) Eventually, Aplin told Harvey that he could not keep up because of his health. (ECF No. 28, PageID.202.) Harvey brought Aplin over to Faurecia's medical department and stated, "maybe they can give you a job at Wal-Mart as a greeter." (ECF No. 28, PageID.183.)

The medical department suggested that Aplin obtain work restrictions from his doctor. So Aplin called his doctor, and his doctor provided that Aplin "has restrictions for no lifting and no fast pace work." (ECF No. 28, PageID.241.) These restrictions were due to Aplin's kidney disease, hypertension, or hyperglycemia, or some combination of those conditions. (*See* ECF No. 28, PageID.138–139.) Aplin explains that in combination, these conditions cause him to "get tired easily." (*Id.* at PageID.138.)

Restrictions of lifting no more than five pounds and no fast-paced work were brought to the attention of Faurecia, but the company was not able to find a position for Aplin that fit those restrictions. In particular, supervisors and management at Faurecia completed a "Saline [Michigan] Plant Restrictions Form." (ECF No. 39, PageID.427.) On the form, Aplin's supervisor checked a box stating, "I CANNOT place this employee in my dept. within his/her stated medical restrictions." (ECF No. 39, PageID.427.) The superintendent (which, apparently, headed a larger group), checked a box that said the same thing. (*Id.*) So too the area manager. (*Id.* at PageID.428.) Even Aplin's union indicated that there were no jobs available to someone with his restrictions. (*Id.*) So Aplin was forced to take unpaid leave.

In September 2016, Aplin was cleared for and returned to work. Aplin explains: "I [had] asked my doctor to lift my restrictions so I could work." (ECF No. 1, PageID.5.) His doctor obliged, stating that Aplin "may go back to work without restrictions." (ECF No. 28, PageID.190.) Aplin restarted on a production line, but this time for a Mustang door. (*Id.* at PageID.205, 233.)

3

Over the next five months, Aplin spent time at three different workstations on the Mustang door line: a pushpin station, a wire station, and a "200%" station. (*Id.* at PageID.206.) The pushpin station was the most demanding; that station required Aplin to put in five pushpins and use a power screwdriver to install three screws, all in 58 seconds. (*Id.* at PageID.146, 205–206.) Aplin had difficulty completing the work of the pushpin station in time, but received help form a coworker. (*Id.* at PageID.205.) A video of Aplin gives a sense of the work. (ECF No. 39, PageID.430 (citing https://photos.app.goo.gl/aJZVYhXA7PrpJJJY6).) Although it was difficult for Aplin to keep up, he managed for about five months. (ECF No. 39, PageID.206.)

Things changed in March 2017. Earlier that year, an employee who could not operate a power screwdriver because of carpal tunnel syndrome was given the foam-installation station on the Mustang door line as an accommodation. (ECF No. 28, PageID.206.) By March, however, Faurecia eliminated the foam-installation station and combined it with pushpin installation. (ECF No. 28, PageID.207, 235.) The worker with carpal tunnel syndrome then took over Aplin's workstation at the time, the wire station. (ECF No. 28, PageID.207.) Aplin was placed on the new, combined foam-pushpin workstation. Aplin asked a "gap leader" why he was put on that station, and she responded, "I know but I don't know." (ECF No. 28, PageID.207.)

That first day on the foam-pushpin station, Aplin found it difficult to complete the work in the 58 seconds allotted (at one point, Aplin says it was 44 seconds, but the precise time is immaterial). (ECF No. 28, PageID.147, 207.) Aplin compares the work of one workstation to the work of the foam-pushpin workstation by using an analogy: "It's like a track and field runner who ran the[] 100 yard dash in 9.6 seconds and then [being] asked by the coach to run [120] yard dash in the same 9.6 seconds[,] many times a day." (ECF No. 39, PageID.323.) Aplin says that one of the gap leaders wrote on a board that his station was causing a big slowdown. (ECF No. 28,

4

PageID.207.) Aplin struggled through his first day on the new foam-pushpin station and slept only three hours that night. (*Id.* at 207–208.)

The next day, March 15, 2017, Aplin started his 12-hour shift at 3:00 a.m. (ECF No. 28, PageID.208.) Aplin was having difficulty keeping up, and midway through his shift the "gap leader," a 22-year-old, tapped Aplin on the shoulder and told him that Aplin's supervisor, D'Andre Clark, and someone studying the line's efficiency, wanted to speak with Aplin. (*Id.* at PageID.208.) Clark told Aplin to watch the gap leader do the job; Aplin watched for 10 minutes while the 22-year-old completed 10 parts, each within the allotted 58 seconds. (*Id.* at PageID.208.) Aplin told Clark and the observer that he could not do what the 22-year-old was doing. (*Id.* at PageID.147.) The person studying the line's efficiency asked why not, and Aplin responded, "I can't do it because of my age and my health." (*Id.*) He did not specify his age or health conditions. But Aplin recalls, "they both stood up and backed up and said, no, no, no, no, no, no, no, no. And there was a silence for about a minute and a half." (*Id.*) "[F]inally," says Aplin, "D'Andre [Clark] looked over at me and he said, I need you to do that just like she's doing it. And I looked at D'Andre and I said you're requiring me to do the stamina, the speed, and the work that she's doing at that fast pace in 44 seconds like she's doing? And he said, yes, I am. I said, I'm telling you, I can't do it because of my age and my health. And he said, you're gonna do it." (*Id.* at 147–148.) For the rest of his first day on the combined station (March 15), Aplin tried to make it work. (ECF No. 18, PageID.2148.) But he fell behind. (*Id.*)

Aplin recalls that at the end of the day, Clark stated, "starting tomorrow when you come in, I want you to get . . . this job down to 44 seconds. And I said, D'Andre, I'm telling you I can't do it because of my age and my health. I can't do it. And I said, my doctor also diagnosed me recently with cataracts in both eyes. My vision is not like it was. I can't run that power screwdriver.

5

My arms and hands won't move quick like that for 8, 10, 12 hours. I can't do it. He said, you're going to do it. When you return to work, I want you to get on that station and you work it down until you get that down to that time." (ECF No. 28, PageID.148.)

Aplin went home that night and took his blood pressure. It was elevated. (ECF No. 28, PageID.148–149.) "I was feeling faint, stressed, harassed because of my age and my health," he recalls. (*Id.* at 149.) Still, Aplin told himself, "I'm going to try to do what I can because I'm not a quitter." (*Id.*) But his blood pressure remained elevated the next morning; so he took a day off under the Family and Medical Leave Act. (*Id.*) Aplin ended up taking two weeks under FMLA due to his blood pressure. (*Id.*)

Aplin never did return to work. (*See* ECF No. 39, PageID.390.) On April 3, 2017, Aplin completed a form advising human resources that he was retiring. In the "comments" section of the form, Aplin wrote, "Retirement because of my health." (ECF No. 35, PageID.392.)

**B.**

After receiving a right-to-sue letter from the U.S. Equal Employment Opportunity Commission, Aplin, with counsel, filed this lawsuit.

Aplin's complaint includes several claims. He asserts that Faurecia discriminated against him because of his age, in violation of the Age Discrimination in Employment Act and Michigan's Elliott-Larsen Civil Rights Act. (ECF No. 1, PageID.3–4.) He also asserts that Faurecia discriminated against him because of his hypertension, hyperglycemia, and kidney disease, in violation of the Americans with Disabilities Act. (ECF No. 1, PageID.3–4.) (Unlike with age, Aplin pleads no disability claim under state law. (*See* ECF No. 1, PageID.3.)) Aplin also brings retaliation claims under the ADEA, Elliot-Larsen, and the ADA. (ECF No. 1, PageID.4.)

Aplin's case proceeded to discovery and eventually to its current stage, summary judgment. During discovery, Aplin's counsel withdrew from the case. (*See* ECF Nos. 16, 20.) Aplin was given the opportunity to retain new counsel, but he did not. (ECF No. 20.) Following a settlement conference, the Court referred all pretrial matters to Magistrate Judge Whalen. (ECF No. 25.) In time, Faurecia moved for summary judgment. (ECF No. 27.)

Magistrate Judge Whalen recommends that this Court grant Faurecia's motion for summary judgment. (ECF No. 34.) In making that recommendation, Magistrate Judge Whalen made a host of findings, only some of which bear repeating here.

Magistrate Judge Whalen found that Aplin's age- and disability-discrimination claims failed for many reasons. Aplin could not establish a prima facie case of age discrimination because there was "no evidence" that Aplin suffered an adverse employment action (ECF No. 34, PageID.283) and because there was "no evidence" that Aplin "was replaced by" or "treated less favorably than" a younger employee (*id.* at PageID.288). As for disability discrimination, Magistrate Judge Whalen found that Aplin could not establish a prima facie case for the following reasons: there was "no evidence" that Aplin suffered an adverse employment action (*id.* at PageID.283), Aplin "testified that there was no accommodation that would have allowed him to perform fast-paced work" (*id.* at PageID.286), the "evidence suggest[ed] that Faurecia had no reason to know that Plaintiff's disability precluded him from performing the new job duties" (*id.* at PageID.287), and there was no evidence that Aplin "was replaced by" or "treated less favorably than" a non-disabled employee (*id.* at 288). And, said Magistrate Judge Whalen, even if Aplin could make out a prima facie case of age or disability discrimination, Faurecia had eliminated the foam workstation and created the combined foam-pushpin workstation for efficiency reasons (*id.* at PageID.290), and Aplin's mere belief that Faurecia was motivated to assign him to the combined

7

workstation because of his age or disability did not rebut Faurecia's non-discriminatory rationale (*id.* at PageID.291–92).

Regarding Aplin's failure-to-accommodate claim under the ADA, Magistrate Judge Whalen found that the claim also failed for multiple reasons: Aplin "did not request an accommodation" (ECF No. 34, PageID.294), he "was not qualified to do the work" (*id.* at PageID.295), and Faurecia had no reason to know that Aplin's disability affected his ability to "perform the additional tasks" (*id*).

Finally, Magistrate Judge Whalen turned to Aplin's retaliation claims. In his view, a reasonable jury could not find that Aplin had engaged in conduct protected by the ADEA, the ADA, or ELCRA and so any retaliation by Faurecia was not prohibited by those statutes. (ECF No. 34, PageID.298.)

## II.

Although Aplin has filed objections to Magistrate Judge Whalen's report and recommendation, they are procedurally improper.

To understand why, it is useful to know a bit about the Federal Magistrates Act and the requirement that objections be specific. "The Act grew out of Congress' desire to give district judges 'additional assistance' in dealing with a caseload that was increasing far more rapidly than the number of judgeships." *Thomas v. Arn*, 474 U.S. 140 (1985). To preserve the efficiency benefits provided by the Act, parties are required to make specific objections to a magistrate judge's report if they would like a district judge to consider their issues. Absent specific objections, "[t]he district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless. The functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of

time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act." *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991); *see also Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) ("[T]he district court need not provide de novo review where the objections are frivolous, conclusory or general. The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." (internal quotation marks, citation, and alteration omitted)).

Not only must objections be specific, they generally cannot raise issues not presented to the magistrate judge. In particular, "courts have held that while the Magistrate Judge Act . . . permits de novo review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate [judge]." *Murr v. United States*, 200 F.3d 895, 902 (6th Cir. 2000); *see also Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("Allowing parties to litigate fully their case before the magistrate [judge] and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act." (internal quotation marks omitted)). Indeed, this Court has previously stated, "It entirely undercuts that purpose to permit a litigant to run one case by the magistrate judge and another by the district judge." *Boyd v. McCabe*, No. 16-CV-12741, 2019 WL 3852582, at *2 (E.D. Mich. Aug. 16, 2019) (Michelson, J.); *see also Weatherspoon v. Dinsa*, No. 14-CV-12756, 2015 WL 5634448, at *3 (E.D. Mich. Sept. 25, 2015) (Michelson, J.).

While this Court generally does not consider an issue not presented to the magistrate judge, it generally will consider an issue already presented to the magistrate judge. *See e.g.*, *Boussum v. Campbell*, No. 16-12930, 2019 WL 442129, at *1 (E.D. Mich. Feb. 5, 2019). Indeed, if this Court is not inclined to consider never-raised issues, it would not make sense to refuse to consider

9

previously raised issues. As the Sixth Circuit has recently stated, "[plaintiff] rightfully complains that the district court's definition of what constitutes a proper objection creates a null set. A party can make no arguments supporting its objection under the district court's standard: Either the argument is prohibited because the party did previously make that argument, or it is prohibited because the party did not previously make that argument." *Pearce v. Chrysler Grp. LLC Pension Plan*, 893 F.3d 339, 346 (6th Cir. 2018).

With that backdrop, Aplin's objections can take the stage. Large portions of Aplin's objections fail the specificity requirement. For example, Aplin recounts in detail facts surrounding an incident where he did not wear safety glasses and was accused of being insubordinate. (ECF No. 39, PageID.320.) But he does not explain how this recitation of what happened affects the Magistrate Judge's legal findings. Aplin also objects to the Magistrate Judge's characterization that he was "allowed" a five-month leave of absence—from Aplin's perspective he had no choice to but to take leave. (*Id.* at PageID.321.) But, again, Aplin does not explain how recharacterizing his leave from voluntary to involuntary affects any of the Magistrate Judge's legal determinations. A significant portion of Aplin's objections are also a summary of what happened on his last day on the line. (ECF No. 39, PageID.324.) But Magistrate Judge Whalen summarized Aplin's last day in his report (ECF No. 34, PageID.274), and, again, Aplin does not explain how his version of the events undermines any of the Magistrate Judge's legal findings. Indeed, nowhere in his objections does Aplin cite a single case or attempt to map his account of the facts to the elements of an ADEA, ADA, or Elliot-Larsen claim. (*See generally* ECF No. 39.) So Aplin's objections are, in many ways, not specific objections that sufficiently inform this Court of how the Magistrate Judge might have erred.

Moreover, Aplin's objections differ from what was presented to the Magistrate Judge, arguably running into the bar on presenting new issues in objections. In seeking summary judgment, Faurecia prepared a 25-page brief and attached excerpts of depositions and declarations. (*See* ECF No. 27.) In response, Aplin filed a two-page brief that did not do much more than take the "questions presented" portion of Faurecia's brief, write short answers, and refer to his personnel file and video evidence. (ECF No. 32, PageID.250–251.) Aplin attached only eight pages of evidence and did not refer to that evidence in his brief. (*See id.*) And, according to Magistrate Judge Whalen, although video was referenced, none was submitted. (ECF No. 34, PageID.286.) In contrast to his summary-judgment response, Aplin's objections include lengthy factual narratives about particular incidents. Aplin did not present those narratives to the Magistrate Judge. In addition, in his objections, Aplin attaches his entire employee file along with other evidence. (ECF No. 39, PageID.335–430.) Again, Aplin only presented eight pages of evidence to the Magistrate Judge. So Aplin has come close to presenting one case to the magistrate judge and a different case to the district judge.

Each standing alone—the lack of specificity and the difference in the presentation to the Magistrate Judge and this Court—is not enough to say that Aplin's objections are improper. But putting the two deficiencies together, Aplin's objections are improper and do not invoke this Court's de novo review. Thus, on procedural grounds alone, the Court will adopt the Magistrate Judge's report and recommendation.

### III.

Recognizing though, that Aplin has arguably made some specific objections and, more importantly, that he proceeds without counsel, the Court alternatively addresses the merits of his objections de novo.

**A.**

Aplin's first objection relates to what he claims was increased scrutiny by Harvey following an incident in October 2015.

Here is what happened. Aplin forgot to put on his safety glasses as he left the breakroom. (ECF No. 39, PageID.402.) The plant manager, Glenn Dozier, was walking toward Aplin and told Aplin to be sure he had them on at all times. (*Id.*) Aplin tried to explain the situation to Dozier. (*Id.* at PageID.402–403.) According to a statement that Aplin wrote shortly after the incident (a statement that was not provided to the Magistrate Judge), Aplin's explanation prompted Dozier to step toward Aplin as though he did not want to hear an explanation and again tell Aplin to wear his glasses at all times. (*Id.*) At that point, Aplin told Dozier, "I already had my glasses on when I approached you and why are you talking to me like I'm a little kid? I'm older than you are so don't talk to me like a kid." (*Id.*) Faurecia did an investigation and ultimately suspended Aplin for three days. (ECF No. 39, PageID.399–403.)

In his objections, Aplin claims that after the incident, Harvey retaliated or discriminated against him. Aplin says that he saw Dozier and Harvey talking the day after the incident, and after that, Harvey pressured Aplin every day and twice did not pay Aplin for vacation time. (ECF No. 39, PageID.321.) Apparently, the increased pressure was in the form of more work—a situation similar to the one that occurred later, on the Mustang line. (*See* ECF No. 28, PageID.179–180, 243.) Although he did not raise the point before the Magistrate Judge or in the complaint, Aplin now says that he asked younger individuals who worked under Harvey if their vacation ever went unpaid; each allegedly said no. (ECF No. 39, PageID.321.)

Taking all the facts in the light most favorable to Aplin, it is not unreasonable to think that Harvey was slightly biased against older employees. As noted, Aplin testified that on the line one

12

day, Harvey indicated that Aplin could work faster if he was a "younger person." And, perhaps, age animus could be inferred from Harvey's "Wal-Mart greeter" remark.

But that weak evidence of age-based animus is not enough for a jury to find that Aplin's age was a factor motivating Harvey's assignment of more work or not providing paid time off. (The Court will assume in Aplin's favor that the less demanding "motivating factor" standard of causation applies here; although the ADEA requires but-for causation, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009), Aplin has an age claim under ELCRA too, and ELCRA may require only that age be a motivating factor, *see Lowe v. Walbro LLC*, 972 F.3d 827, 832 (6th Cir. 2020) (discussing conflicting Michigan Supreme Court precedent).)

Take the pay issue first. Aplin's statement that younger employees under Harvey were always paid for their vacation time is not admissible evidence because it is not sworn and appears in a brief rather than an affidavit. *See, e.g.*, *Inglesias v. Davis*, No. 07-1166, 2009 WL 87574, at *3 (6th Cir. Jan. 12, 2009). Moreover, it hardly seems fair for Aplin to introduce this fact now, given that Faurecia now has no chance to collect contrary evidence. And setting aside Aplin's assertion that Harvey provided all 21- to 39-year-olds their vacation pay, all Aplin has left is Harvey's two off-hand statements about age. That limited evidence of animus is not enough for a reasonable jury to find that Harvey did not give Aplin paid-time-off on two occasions because of Aplin's age.

As for the increased workload that Harvey imposed, Aplin says that occurred after the safety-glasses incident. (ECF No. 39, PageID.321.) But, even assuming this is an adverse employment action, it was Aplin, not Dozier or Harvey, who injected age into the safety-glasses incident. And even if Harvey was upset at Aplin because of the incident, that would not show that he was motivated to pressure Aplin because of his age—perhaps Dozier and Harvey were simply

13

upset with how Aplin spoke to Dozier. Indeed, Aplin's own account suggests that age was not a factor: "I think it was part of, you know, Glenn Dozier saying, hey, you know, [Aplin] is disagreeing with me and I didn't like the disagreement we had . . . and [Dozier] wanted Mark Harvey to kind of pressure me, you know." (ECF No. 28, PageID.186.)

As for retaliation, Aplin must show that he engaged in protected conduct—that he somehow opposed age discrimination. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012). But the safety-glasses incident was not protected conduct because it was not in opposition to age discrimination. And to the extent that Aplin believes his complaints about vacation pay were protected conduct, he has no evidence that he mentioned age discrimination when he complained about the unpaid vacation time.

Accordingly, Aplin's first objection does not show that a reasonable jury could find that he was discriminated against because of his age or retaliated against for opposing age discrimination.

**B.**

Next, Aplin takes issue with how Magistrate Judge Whalen characterized his five-month leave. Magistrate Judge Whalen said that Faurecia "allowed" Aplin to take leave. Aplin sees it differently: Faurecia could not find a job that fit his restrictions (lifting at most five pounds and no fast-paced work), and so he was forced to take leave.

But even if "forced" is a better characterization than "allowed," Aplin has not shown how being forced to take leave makes a legal difference. To be sure, the ADA requires an employer to make reasonable accommodations for a person's disabilities. But "[e]mployers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual." *Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 257 (6th

14

Cir. 2000). Further, "if an individual's disability renders him unable to perform an 'essential function' of his job, he is not a 'qualified individual' protected by the [ADA's] nondiscrimination provision." *Camp v. BI-LO, LLC*, 662 F. App'x 357, 361 (6th Cir. 2016). Here, Aplin's supervisor, the superintendent, the area manager, and the labor union all stated that there were no jobs for someone who could lift only five pounds and could not perform fast-paced work. (ECF No. 39, PageID.426–427.) Faurecia also avers that "fast-paced work is an essential function and fundamental job duty" (ECF No. 28, PageID.232), and Aplin has offered no evidence to the contrary. So even if Aplin was forced to take unpaid leave because Faurecia could not find a job that fit his limitation, that does not amount to a violation of the ADA.

## C.

Aplin's last objection is simply a recitation of what happened on his last day on the line. Here is a quick recap: Aplin was asked to work the combined foam-pushpin workstation; the 22-year-old gap leader could complete the work in the time allotted, but Aplin could not; Aplin repeatedly told his supervisor, Clark, that he could not complete the work because of his "age and health," but Clark insisted that he stay on the station and get the job done; at the end of his first day on the combined station, Clark told Aplin he would have to stay on the station and get his time down to 44 seconds; Aplin's blood pressure was elevated, and he was never able to bring it down; after two weeks of leave, Aplin resigned "because of [his] health."

For several reasons, the events of Aplin's last day of work would not permit any reasonable jury to find that Faurecia is liable for age or disability discrimination.

Start with age discrimination. Although the claim probably fails on other grounds as well—like lack of evidence of an adverse employment action—Aplin also lacks evidence that Clark or someone else at Faurecia was motivated to assign and to keep him on the combined foam-pushpin

15

workstation because of his age. Faurecia has come forth with evidence that it eliminated the foam workstation and created the combined foam-pushpin workstation for efficiency reasons. (ECF No. 28, PageID.234.) Aplin has no contrary evidence. And Aplin has cited no evidence that Faurecia picked him for the combined foam-pushpin workstation because of his age. For instance, Aplin has no evidence of Clark ever making any age-biased statements. To be sure, after he was assigned the station, Aplin repeatedly told Clark that he could not perform the job because of his age (and health). But it does not follow from Clark's knowledge of Aplin's age-related struggles that age was a reason that Clark (or anyone at Faurecia) decided to keep Aplin on that harder job that he had only tried to perform for two days. In other words, while Clark may have kept Aplin on the foam-pushpin workstation *despite* Aplin's age, it is not fair to infer that Clark did so *because of* Aplin's age. That might be a fair inference if Faurecia wanted Aplin to quit so it could fill his spot with a younger person. But Aplin has produced no evidence that after he resigned, Faurecia filled his position with a younger person. *See Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) ("A person is considered replaced only when another employee is hired or reassigned to perform the plaintiff's duties. A person is not considered replaced when his duties are absorbed by another person or when the work is redistributed among other existing employees already performing related work." (internal quotation marks omitted)).

And setting aside for the moment Aplin's failure-to-accommodate claim, his disability-discrimination claim fails for a like reason. Aplin has no evidence that had he not been disabled, he would not have been assigned to the combined foam-pushpin workstation. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 319 (6th Cir. 2012) (en banc) (providing that ADA claims require but-for causation). And, again, Clark's decision to keep Aplin on the combined workstation despite knowing that Aplin's health made it too challenging is not the same as Clark deciding to keep

16

Aplin on the combined workstation because of some animus to Aplin's disability or people with disabilities.

That leaves Aplin's failure-to-accommodate claim. No jury could find for Aplin on this claim for two reasons.

First, Aplin lacks evidence that he ever requested an accommodation. Aplin testified:

> Q. So in 2017 . . . . at the time that you were having trouble performing the particular job that you described, did you request any accommodation of the company to allow you to work?
> A. No.
>
> Q. In fact, did you request any accommodation whatsoever from the company after you returned to work in late 2016 from your extended leave of absence?
> A. No. No, I did not.

(ECF No. 28, PageID.152.) In fairness, Aplin did repeatedly tell Clark that he could not keep up on the foam-pushpin workstation because of his "health." And Aplin did not have to use special words to request a different position as an accommodation. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) ("If an employee requests assistance in identifying vacant positions— even a request as generic as 'I want to keep working for you—do you have any suggestions?'— then the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill."). But, in this case, a fairly explicit request for an accommodation was needed because at the time Aplin was placed on the foam-pushpin station, his doctor had cleared all restrictions, and Aplin had been working on the Mustang door line for five months. So no reasonable jury could find that after Aplin was placed on the foam-pushpin station, he requested a reasonable accommodation.

Aplin's failure-to-accommodate claim fails for a second, independent reason: he has not shown that, with a reasonable accommodation, he could perform the essential functions of a production line worker at Faurecia. *See Camp v. BI-LO, LLC*, 662 F. App'x 357, 361 (6th Cir.

17

2016) (providing that employee must be able to perform essential functions with (or without) an accommodation). Indeed, Aplin's whole point is that he could not do the combined foam-pushpin workstation. As for other workstations, Faurecia swears that "fast-paced work is an essential function and fundamental duty" (ECF No. 28, PageID.232), and, as noted, Aplin has not produced contrary evidence. Aplin also does not have evidence contrary to Faurecia's sworn statement that "[j]ob duties and assignments are rotated amongst operators" and "operators do not have a permanent production line assignment." (*Id.*) As such, Aplin has not produced evidence showing that he was qualified to be a production line worker at Faurecia.

## IV.

In sum, because Aplin's objections are not procedurally proper, they do not trigger de novo review of any issues; for that reason, the Court ADOPTS Magistrate Judge's report and recommendation (ECF No. 34). Alternatively, the Court has considered the merits of Aplin's objections and overrules them; for that alternative reason, the Court ADOPTS Magistrate Judge's report and recommendation. Thus, for the reasons stated here and in the Magistrate Judge's report, Faurecia's motion for summary judgment (ECF No. 27) is GRANTED. This case is DISMISSED.

SO ORDERED.

Dated: October 26, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE
